# EXHIBIT 7



# Technology Licensing
## Corporate Strategies for Maximizing Value

Edited by

Russell L. Parr and Patrick H. Sullivan

Case 2:19-cv-01602-PSG-DFM   Document 146-9   Filed 12/29/23   Page 3 of 11   Page ID #:3214

# Technology Licensing

## Corporate Strategies for Maximizing Value

Edited by

Russell L. Parr

Patrick H. Sullivan



John Wiley & Sons, Inc.
New York • Chichester • Brisbane • Toronto • Singapore

This text is printed on acid-free paper.

Copyright © 1996 by John Wiley & Sons, Inc.

All rights reserved. Published simultaneously in Canada.

Reproduction or translation of any part of this work beyond that permitted by Section 107 or 108 of the 1976 United States Copyright Act without the permission of the copyright owner is unlawful. Requests for permission or further information should be addressed to the Permissions Department, John Wiley & Sons, Inc., 605 Third Avenue, New York, NY 10158-0012.

This publication is designed to provide accurate and authoritative information in regard to the subject matter covered. It is sold with the understanding that the publisher is not engaged in rendering legal, accounting, or other professional services. If legal advice or other expert assistance is required, the services of a competent professional person should be sought.

*Library of Congress Cataloging in Publication Data:*
Technology licensing strategies / [edited] by Russell L. Parr, Patrick H. Sullivan.
    p.  cm.—(Intellectual property library)
  Includes bibliographical references.
  ISBN 0-471-13081-8 (cloth : alk. paper)
  1. License agreements—Economic aspects.  2. Technology transfer—Valuation.  3. Royalties.  I. Parr, Russell L.  II. Sullivan, Patrick H.  III. Series: Intellectual property library (John Wiley & Sons)
HF1429.T43  1996
338'.064—dc20                                          95-53195
                                                                 CIP

10 9 8 7 6 5

## INTELLECTUAL PROPERTY SERIES

*How to License Technology*
Robert C. Megantz

*Intellectual Property Infringement Damages: A Litigation Support Handbook*
Russell L. Parr

*Intellectual Property: Licensing and Joint Venture Profit Strategies*
Gordon V. Smith and Russell L. Parr

*Law and the Information Superhighway: \*Privacy \*Access \*Intellectual Property \* Commerce \*Liability*
Henry H. Perritt, Jr.

*Managing Intellectual Property Rights*
Lewis C. Lee and J. Scott Davidson

*Multimedia Legal Handbook: A Guide From the Software Publisher's Association*
Thomas J. Smedinghoff

*The New Role of Intellectual Property in Commercial Transactions*
Melvin Simensky and Lanning G. Bryer

*Protecting Trade Dress*
Robert C. Dorr and Christopher H. Munch

*Protecting Trade Secrets, Patents, Copyrights, and Trademarks*
Robert C. Dorr and Christopher H. Munch

*Software Industry Accounting*
Joseph M. Morris

*Software Patents*
Gregory A. Stobbs

*Technology Licensing Strategies*
Russell L. Parr and Patrick H. Sullivan

*Valuation of Intellectual Property and Intangible Assets, Second Edition*
Gordon V. Smith and Russell L. Parr

# 2

# Key Terms and Strategic Positioning

*Patrick H. Sullivan*

The ICM Group

The licensing of technology has become an area of increasing profitability for knowledge-based companies. Recent court decisions upholding the rights of innovators have led not only to reimbursements and back payment for patent infringements but also to substantial damages awards. The *financial* importance of technology licensing has alerted business as well as technology managers in knowledge-based companies to the need for well-conceived and concisely articulated licenses that contribute to the bottom line.

In the past, the commercialization of technology, of which licensing was a major component, was usually accomplished by the CEO or the corporate attorney, working on instinct. There were few guidelines or norms, and success depended directly on the background and experience of the person directing the commercialization activity. As long as licensing held only limited importance to the firm, such a hit-or-miss approach was acceptable. Today, however, the business environment for knowledge-based companies means that licensing, both in-licensing and out-licensing, has become a fundamental part of the firm's business strategy. And to be a solid part of the firm's business strategy, licenses must reflect a wide range of considerations, external as well as internal.

## LICENSING AS A CONVERSION MECHANISM

At the conceptual level, the commercialization of intellectual assets involves two kinds of activities. The first is the evolution of a marketable concept from initial thought through research, product development, manufacturing, distribution, and finally sale to the end-user. The second aspect of commer-

15

cialization is called the conversion mechanism. Simply stated, conversion mechanisms are the devices that companies along the commercialization chain use to convert their knowledge or service into cash.

Consider a research company. It has no manufacturing facilities, no distribution capability, and no retail function. It makes its contribution by creating marketable innovations. This company converts its innovations to cash by licensing them to manufacturers. In this case, the mechanism used to convert the firm's asset (the innovation) to cash is a license. Another firm may have innovations as well as manufacturing capability but no ability to distribute or sell to end-users. For a company such as this, the conversion mechanism might be the sale of manufactured goods to a distributor. Equally, the manufacturer could convert its assets into cash through a joint venture with a company that has both distribution and sales capabilities.

The point is that there are several different conversion mechanisms that firms may use to convert their knowledge or services into dollars. The typical list of conversion mechanisms contains a number of possibilities. Sale of the rights to the innovation is the most obvious way of converting knowledge into cash. A second alternative is to license the innovation, thereby retaining the basic ownership but allowing someone else the right to use it. A third alternative is a joint venture with one or more companies. Typically joint ventures are undertaken when the owner of the rights to an innovation has some but not all of the business assets required to commercialize it fully. In this case, the owner may strike agreements for the use of the required business assets owned by one or more other companies. A fourth form of conversion mechanism is the strategic alliance. Strategic alliances are developed when a firm with an innovation and the required business assets does not have access to an adequate market. When this is the case a firm may establish an alliance with a company that has market access or positioning but not give it any rights to the innovation.

Licensing is only one of the ways in which innovators can convert their product or service ideas into cash. In the past, when the courts did not provide the support for ownership rights that they currently do, licensing was not necessarily a key component of a commercialization strategy. Now, however, with the increase in the value of innovation due to the increasing strength the courts have placed on ownership rights, firms are becoming more interested in developing stronger and more innovative licenses as well as strategies for using the licenses to achieve the firm's strategic objectives.

## FACTORS AFFECTING LICENSING AND ROYALTY TERMS

A wide range of factors affect the setting of licensing terms as well as the amount of royalties required by the license. Indeed, the list of potential li-

censing terms is almost as long as there are people to contribute to it. But a relatively small number of factors are of primary importance.

*Major Factors.* Two factors dominate discussions of licensing and royalties: competitive strategy and duration.

1. *Competitive Strategy.* The first and by far the most basic consideration is whether and how the potential license could be structured to the competitive advantage of the out-licensing firm. This anticompetitive view of licensing is strongly held by most firms involved in competitive businesses. For knowledge-based firms, the use of licenses as part of a competitive strategy is of the utmost importance. Firms that survive by selling the products of their intellectual capital must ensure that the licensing of their intellectual assets or know-how will be done only if it either enriches the owning firm at the expense of the competition or if the licensor puts the competing licensee at a strategic disadvantage position.

    The first question firms tend to ask when approaching a license discussion with another is: is this company a current or potential competitor? If the answer is yes, then the firm must create a set of terms and conditions that will either improve its own strategic position or in some way worsen the tactical or strategic position of the competitor.

2. *Duration.* The second major factor affecting licensing terms and royalty amounts is the length of time the license is to be in force. Licensors that believe their technology may be short-lived will press for long-term duration while licensees will take the opposite view. Similarly, licensees that believe a currently low-royalty technology is likely to become a hot market property will want to lock in a long-term license at favorable terms.

    License duration thus is in some ways a surrogate for, or a result of, a number of other factors that affect both terms and rates. For example, it may be an indicator of the commercial success of the technology, its current or potential level of refinement, its acceptability in the marketplace, or its immunity (or lack of immunity) from substitute technologies. Duration, for all of the foregoing reasons, is a principal topic of every license discussion.

*Other Factors.* Six other factors often affect the final licensing terms, royalty rates, or both. These factors are:

1. *Protection:* The nature and amount of protection that a licensor offers to the licensee is a major consideration. The licensee must be assured not only that adequate legal protection is in place, but also

that the licensor is prepared to enforce and capable of enforcing this protection against infringers.

2. *Exclusivity:* The nature and degree of exclusivity offered is another frequent consideration. Exclusivity exists in both specific areas and degrees. An area of exclusivity might be a territory or market. A license might be completely exclusive or exclusive under specified terms. Licenses that offer absolute exclusivity with no conditions are worth more than licenses that offer only area or conditionally exclusive arrangements.

3. *Utility/Advantage:* The usefulness or amount of advantage the technology confers upon the licensee is also of concern. Technologies offering a marketplace head start on the competition are more valuable than those that merely provide opportunities for keeping up. Technological capabilities that will enrich the licensee firm and allow it to develop capabilities to significantly enhance its strategic position are the most valuable.

4. *Commercial Success:* Technologies that are proven to have marketplace appeal and that significant increase sales are more valuable than technologies that are untested in the marketplace or whose commercial success is not an issue.

5. *Refinement:* The maturity or immediate applicability of a technology often affects the terms and royalty rates of a license. Technologies that require development or refinement before they can be commercially applied are less valuable than are technologies that can be immediately used in the design or manufacture of products for the marketplace.

6. *License Commitment:* Negotiators look at the degree to which the licensor is committed to ongoing support of the license. Licensors unwilling to actively pursue infringers, to continue seeking barriers to infringement, to provide ongoing training and support, or to continue development of the technology will find licensees unwilling to pay high royalty rates for their technology.

## COMPANY STANCE

We have all observed that a person's perspective can color judgment about the thing that is viewed. A roaring surf, viewed from the beach, is a powerful and beautiful scene. A roaring surf, viewed from the small boat whose crew wants to land on the beach, is awesome and quite terrifying. Differing perspectives greatly affect the view of licensing, licensing negotiation, and even the desirability of selected terms in a license agreement. In the case of licensing, we call the different perspectives of the participants their stance or posture.

A firm's stance or posture is not only a major determinant of how it views the terms and conditions of a potential license, but may also be a major predictor of the outcome of the license negotiations. For both out-licensing and in-licensing, there are active and passive participants. Each side naturally assumes distinct roles and positions.

### Out-Licensing Firms

*Strategic out-licensors* are firms actively seeking to generate income from their strategic intellectual property, either through product sales or through the licensing of their technologies. Energetic firms are willing to invest in harvesting their portfolio of intellectual properties.

*Opportunistic out-licensors* are firms interested in receiving income on nonstrategic intellectual property, but not ready to invest substantially in an active harvesting of the firm's intellectual property portfolio.

### In-Licensing Firms

*Seekers of technology* are companies actively interested in obtaining already-developed technology rather than bearing the cost of creating it. They are willing to pay for technology, but not to overpay.

*Infringers* are companies found to be infringing upon the patent rights held by another person or firm.

## The Effect of Company Stance on Licensing Objectives

Although the details of a firm's licensing objectives are unique to its technological, business, and legal situation, the firm's stance also is a major determinant of its licensing objectives:

*Strategic out-licensors* are interested in developing income from their licenses. To do so they are willing to invest in the creation of an income-generating licensing office. Typically such firms usually press for early cash flow.

*Opportunistic out-licensors* are relatively passive in their approach to the market. By definition, such companies either license only their nonstrategic intellectual properties or they do not make the internal investments necessary to obtaining a stream of licensing income. Opportunistic out-licensors seek terms and royalty rates that are consistent with common industry licensing and royalty practice.

*Technology seekers* are individuals or firms looking for rapid closure on a technology license so they may implement the technology quickly. Firms in this position seek royalty rates that are low enough to provide what they consider to be a good profit.

*Infringers* are individuals or firms that, for whatever reason, are already using the intellectual property of someone else. They are usu-

ally already in the marketplace, and for this reason the finances of their production activities are established and their costs and profit margins are known. They know that any new costs, such as royalty payments, will cut into their existing margins and profits. Therefore, the strategies of firms in this position tend to focus on seeking ways to pay the lowest possible royalty as well as on ways to delay payment as long as possible.

**The Effect of Company Stance on Licensing Strategies**

In addition to its effect on licensing objectives, company stance also has an effect on general licensing strategies. Strategic out-licensors, for example, tend to follow a three-step strategy. First, they identify potential licensees, both seekers and infringers. Second, they target companies that are financially capable of paying royalties, such as firms that sell final assemblies or end products rather than those that sell components or subassemblies. Third, they attempt to minimize the administrative costs of generating licensing income through procedures such as license or patent packaging.

Opportunistic out-licensors tend to follow a different strategy. They do not actively seek out potential licensees but wait until they are approached or until an infringer's presence becomes known to them. Their licensing strategy tends to have two components. First, they seek terms and royalty rates that are consistent with industry norms. Second, they too work to keep down the administrative costs of licensing and, like their more energetic cousins, seek administrative mechanisms to minimize the costs of obtaining or overseeing their licenses.

On the in-licensing side, technology seekers have an active two-pronged strategy. First, technology seekers identify the practical range of alternative sources of the technology they seek. As part of this strategy component, they learn in some detail the costs associated with each alternative. After examining the costs, if licensing is the best cost alternative, these firms seek out the owners of the technology and press for rapid closure on a license. The second component of their strategy concerns the price (royalty) they are willing to pay. Because they already know what their cost alternatives are, firms in this position are able to determine how much they are willing to pay to the licensor in order to realize their own profit objectives. Licensors unwilling to agree to the acceptable cost to the technology seeker will find that companies in this position would rather leave the table and pursue their other alternatives than pay more than the technology is worth to them.

Infringers pursue licensing strategies that are very different from those already discussed. They already know both the costs and the value of the technology to their operation. They also know that any royalty payments they are forced to make cut into their profits. Infringers' strategies usually

involve minimizing the amount of royalty to be paid as well as delaying the payment itself for as long as possible. Following this strategy, infringers, on learning that they are being asked to take out a license, will immediately begin to gather cost information, usually identifying alternative sources of the technology, and for each alternative learning what it will cost to obtain. In addition, infringers will identify the amounts probably owed to the owner of the technology and calculate whether it would be cheaper to pay the royalties or to delay and litigate in anticipation of arguing the royalty costs downward.

**The Effect of Company Stance on Licensing Negotiations and Outcomes**

The respective positions of the negotiating parties can often be a major determinant of the success of negotiations. Exhibit 2.1 shows how the positioning of firms can affect negotiations.

**The Effect of Company Stance on Licensing Terms**

A firm's position is also a major factor in the view it holds of any of the factors identified above. Exhibit 2.2 provides some examples of the differing views a firm may hold on any factor, depending upon its positioning. Strategic and opportunistic licensors have more in common with each other in their views on each potential license term than does either kind of license



Exhibit 2.1. Position and Affect on Negotiations

| Factor | Licensors — Aggressive | Licensors — Passive | Licensees — Seekers | Licensees — Infringers |
|---|---|---|---|---|
| Protection | • Have protection, are willing to exchange for financial consideration | | • Want guaranteed protection, particularly if protection is a competitive issue | • Want protection for as long as possible in order to reduce any future payments |
| Exclusivity | • Prefer not to offer exclusive license as this precludes other income from the patent | | • Wants exclusive | |
| Utility/Advantage | | | • See cost advantage of not having to recreate the technology | • See cost advantage of minimizing costs by obtaining license |
| Commercial Success | • Unable to guarantee commercialization success unless other licensees or patent-holders have already commercialized | | • Want some guarantee of commercialization success | • Already know about commercialization success, wants to minimize cost outlay |
| Refinement | • Probably see little refinement required | | • See more need for refinement, which lowers potential profits | • Further refinements unnecessary, by definition |
| Competition Where Licensor & Licensee are Competitors | • Seek cross-licensing terms | | | |
| License Duration | • Minimize duration in order to be able to renegotiate periodically | • Offer license for life of patent | • Seek license for life of the patent | • Seek maximum terms - e.g. license for life of patent |
| Royalty Amount | • Seek maximum | • Seek standard | • For new technology seek running rate, for known technology seek one-time payment | • Seek one-time payment |
| Support/Train | | • Offer after-sale training and support | • Seek after-sale training and support | • No training sought, to minimize cost |
| License Commitment | • De facto commitment to license because it is a source of strategic revenue | • Commitment to license must be requested of passive licensors | • Very interested in commitment to license | • Commitment to license not an issue |
| Enforcement Burden | • Already interested in enforcement | • Enforcement interest unsure; licensee may need to press for guarantees | • Does not want to have to enforce, will seek guarantees of enforcement | • Enforcement already demonstrated |
| Foreign vs. Domestic | • No preference | | • No preference | |
| Crossover Sales | • Cross-over sales may be possible | | • Allow crossover sales if terms are advantageous | • Minimize crossover sales to reduce costs |
| Advice of Expert | | | | |

Exhibit 2.2. Perspectives on Factors Affecting Licensing

have with the other. Licensors are fundamentally businesses with an intellectual asset they wish to convert into dollars through the mechanism of a license. They differ only in the amount of money they seek to obtain for the use of their intellectual property. The two kinds of licensees, on the other hand, differ from each other significantly in their views on potential licensing terms. Infringers want to minimize any cost outlay they make to a licensor. After all, they reason, every dollar we give away in a royalty payment is one less dollar of profit for us. Seekers of technology, in contrast, view licensing as an opportunity to save money. Typically, they have done their homework and know both the cost and the flowtime it would take for them to create the technology on their own. For the seekers, licensing ex-

penditures are part of the cost of obtaining a technology. But for a licensing opportunity, seekers might have to select a more costly solution to their technology acquisition problem.

## LICENSING AND BUSINESS STRATEGY

Most firms tend to think of out-licensing as a method for generating cash and in-licensing as a way of obtaining needed technology. There is much more to the technology licensing story than these simple and relatively narrow views. Licensing is a key part of the business strategy of most well-managed firms.

Many well-managed companies have well-articulated visions of what the owners expect the firm to become. The existence of such a vision makes the work of an executive easier than its absence. With a vision, one can ask whether the next business decision has any implications for the firm's ability to actualize the vision.

In the strategic sense, licensing is one of the company's activities that move it toward the realization of the vision. With this in mind, it is possible to think of a range of ways in which licensing contributes. In the case of some firms, licensing is a method for generating the cash needed for other activities that will lead the company toward its desired future. For firms in this category, cash may be generated by leasing of one or more of their *strategic* intellectual assets (patents from the firm's portfolio). Other firms in this category generate cash by licensing *non*strategic technologies from the portfolio. Another strategic use of licensing is as an anticompetitive activity—licensing may be used as a two-pronged anticompetitive effort. First, licensing a firm's technology to business competitors can be a way of harvesting cash from its markets. Second, licensing key technologies to competitors keeps them from developing their own technological capabilities. Yet another strategic use of licensing is as a way of minimizing the chance of infringement litigation. Where litigation is a concern, firms have found that using cross-licensing with technological competitors is an excellent method for minimizing the probability of an infringement lawsuit.

Licensing can have a range of strategic as well as tactical uses. The rationale for licensing has a strong bearing on the manner and kind of licenses a company may produce. Similarly, the firm's posture in licensing negotiations has much to do with the final form a license agreement will take as well as with its contents.

The positioning of out-licensing as well as in-licensing firms also influences how they approach a license negotiation. This positioning affects their perspective on key license terms and how they will be written. Finally, the wording and content of the non-dollar terms of the license have a major effect on the dollar terms. The more clearly firms understand the effect of po-

sitioning on themselves and on their negotiating partners the better they will be able to develop licenses that meet their needs.

## BIBLIOGRAPHY

*Cases: Patent Damages*

*Del Mar Avionics, Inc. v. Quinton Instrument Co.*, 836 F.2d 1320 (1987)
*Fromson v. Western Litho Plate and Supply Co.*, 853 F.2d 1568 (1988)
*Georgia-Pacific Corporation v. U.S. Plywood Corporation*, 318 F. Supp. 1116 (1970)
*Georgia-Pacific Corporation v. U.S. Plywood Champion Papers*, 575 F.2d 205 (1971)
*Kearns v. Ford Motor Co.*, 726 F. Supp. 159 (1989)
*King Instrument Corp. v. Otari Corp.*, 767 F.2d 853 (1985)
*Lindemann Mashinefabrik v. American Hoist & Derrick Co.*, 895 F.2d 1403 (1990)
*Panduit Corp. v. Stahlin Bros. Fibre Works Inc.*, 575 F.2d 1152 (1978)
*Polaroid Corp. v. Eastman Kodak Co.*
*TWM Manufacturing Co. v. Dura Corp.*, 107 S. Ct. 183, 789 F.2d 895 (1986)

*Books:*

Smith, G. and Parr, R. L. (1989). *Valuation of Intangible Assets*. New York: John Wiley & Sons, Inc.

*Articles:*

Andonion, Joseph K., "New Method to Determine Royalty Rates," *Les Nouvelles*, June 1991, pp. 58–59
Ansell, Ed, "Assessing the Value of Technology," *Law and Business of Licensing*, 1980, pp. 734.7–734.11
"Apple-IBM agreement networks old systems, creates new ones," *Information Access Company*, November 21, 1991, vol. 63, no. 23, p. 13
"Attention IBM PS/2 Clone Makers-Buy Patent Rights Now," *Elsevier Advanced Technology Publications*, March 1988, vol. 4, no. 1
Burke, Steven, Robert L. Scheier, Jimmy Guterman, Richard March, "IBM Intensifies the Campaign," *PC Week*, July 4, 1988, vol. 5, no. 27, p. 1
Chisum, Donald S., "Remedies for Patent Infringement," *AIPLA Quarterly Journal*, 1985, vol. 13, no. 4, p. 380, 386–89
Coale, Kristi, "EFI, Kodak agreement raises patent issues; Agreement increases validity of EFI's claim," *IDG Communications, Inc.*, February 11, 1991, p. 44
Doler, Kathleen, "MicroAge Franchisees want Lowered Royalty Schedules; Company Focuses on Large Sales Accounts," *PC Week*, Ziff-Davis Co., February 13, 1989, vol. 6, no. 6, p. 51
Enlow, Paul M., "Future Changes in Computer Licensing Practices," *The Law and Business of Licensing*, vol. 1 1980 Revision, pp. 506.109–506.112
Finnegan, Marcus B., and Herbert H. Mintz, "Determination of a Reasonable Royalty in Negotiating a License Agreement: Practical Pricing for Successful Technology Transfer," *The Law and Business of Licensing*, Clark Boardman Co., Ltd., N.Y., 1985, vol. 3, Chap. 3, pp. 3D-3–3D-28
Francis, Robert, "Clone Makers Get Warning on Patents," *Datamation*, August 1, 1988, vol. 34, no. 15, p. 28

Goldscheider, Robert, "An Economic Analysis of Royalty Terms in Patent Licenses," *Minnesota Law Review*, April 1983, vol. 67, pp. 1198–1234
Goldscheider, Robert, "Expert Witnessing: The Licensing Process and Intellectual Property Litigation," *Technology Management Handbook*, Clark Boardman Co., Ltd., N.Y., 1984, chap. 23, pp. 191–207
Harbert, Tammi, "Patent Portfolios Emerge as Corporate Money Makers," *Electronic Business Information Access*, Cahners Pub. Co., April 16, 1990, vol. 15, no. 7, p. 53
Jereski, Laura, "Patent Profit," *Forbes*, May 2, 1988, p. 104
Kessler, Edward J., and Robert W. Sacoff, "Products of the Mind," *Trial*, July 1984, vol. 20, no. 7, p. 40(5)
King, F., S. Labrum and G. Franck, "Valuing Intellectual Property," *Les Nouvelles*, December 1991, vol. XXVI, no. 4
Locke, Dennis H., "A Systematic Approach to Patent Valuation," *Idea*, 1986, vol. 27, pp. 1–5
Main, Jeremy, "Business Goes to College for a Brain Drain," *Fortune*, March 16, 1987, p. 80
Manners, David, "Korea; catching up with the best," *Electronics Weekly*, June 26, 1991, no. 1559, p. 17(2)
Marshall, Martin, "IBM Demands License Fees for RISC," *InfoWorld*, July 4, 1988, sec. news, p. 5
Matsunaga, Yoshio, "Determining Reasonable Royalty Rates," *Les Nouvelles*, December 1983, vol. 18, no. 4, pp. 216–19
Matsunaga, Yoshio, "Determining Reasonable Royalty Rates," *The Law and Business of Licensing*, Clark Boardman Co., Ltd., 1985, vol. 3, chp. 3, pp. 3D117–3D125
McGavock, Daniel; Haas, David A.; Patin, Michael P., "Licensing Practices, Business Strategy, and Factors Affecting Royalty Rates: Results of Survey," *Licensing Law and Business Report*, March–April 1991, vol. 13, no. 6
McGavock, Daniel M.; Haas, David A., "Licensing in the Real World: A Survey of Those Who Know," *Licensing Law and Business Report*, May–June 1990, vol. 13, no. 1, pp. 146–56
McGavock, Daniel; Haas, David A.; Patin, Michael P., "Factors Affecting Royalty Rates," *Les Nouvelles*, June 1992, vol. XXVII, no. 2, p. 107
Morais, Richard, "What is Perfume but Water and a Bit of Essence," *Forbes*, May 2, 1988, p. 90
Palmer, Archie M.; Behrens, Meredith W.; Davis, Albert S. Jr., "The Making and Application of Royalty Rates," *Patent Licensing*, Practicing Law Institute, 1958, pp. 56–73
Parr, Russell, "Insights into Royalty Rate Economics," *Les Nouvelles*, June 1990, vol. XXV, no. 2
Powers, N. Richard, "At the End of the Second Rainbow; Calculation of Damages in Patent Cases," *Delaware Lawyer*, March 1989, vol. 7, no. 3, pp. 18–26
Preston, John T., "The Role of the University Licensing Office in Transferring Intellectual Property to Industry," M.I.T.
Reed, Sandra R., "See you in court; Intellectual Property Lawsuits and Computer Crime View From the Valley," *Information Access Company*, Hayden Publishing Co., August, 1989, vol. 13, no. 8, p. 179
Ristelhueber, Robert, "IBM Enters OEM Market for PCs and Subsystems," *Electronic News*, June 29, 1992
Ryan, Alan J., "IBM Hikes PC Royalty Rates," *Computerworld*, April 11, 1988, p. 105
"Sharp and Standard Microsystems Sign Comprehensive Worldwide Royalty-Bearing Semiconductor Patent CR," *PR Newswire Association, Inc.*, September 6, 1989

"Standard Microsystems: Will Commence Legal Proceedings Against Texas Instruments," *PR Newswire Association*, January 19, 1990

"Technology & Licensing Agreements: Toshiba, TI in Royalty-Bearing Cross-Licensing Agreement," *HTE Research, Inc.*, December 24, 1990, vol. 90, no. 18

Teece, David J., "Profiting from Technological Innovation: Implications for Integration, Collaboration Licensing and Public Policy," Elsevier Science Publishers, June 1986

Teece, David J., "The Dynamics of Industrial Capitalism," Haas School of Business, UC Berkeley, May 1992

"The History of the invention and development of the integrated circuit at Texas Instruments," Texas Instruments 1988

Weil, Ulric, "Some vendors use litigation as a profit center," *Information Access Company*, July 20, 1992, vol. 11, no. 15, p. 27

Wilson, Sonsini, Goodrich & Rosati, *Licensing & Intellectual Property Law Bulletin*, June 1991, vol. IV, issue 2

"Unix Files Antitrust Suit Against Microsoft," *Newsbytes News Network*, November 8, 1990

*Journal: Licensing Economics Review:*

Parr, Russell L., AUS Inc., N.J.

"Infringement Cases," September 1991, p. 6

"Insights from the Experts," December 1991, pp. 7, 19

Notes on Kearns v. Ford, September 1990, pp. 4–5

"Reasonable Royalties: An Analysis of the Damages Award in the Kearns v. Ford Motor Company Patent Infringement Case," November 1991, p. 11–16

"Recent Licensing Transactions," November 1990, pp. 2–3

"Recent Licensing Transactions, Taiwanese Firms," February 1991, p. 3

"Recent Licensing Transactions, Japanese Firms," February 1991, p. 3

"Recent Licensing Transactions," July 1991, pp. 4–5

"Royalties," January 1992, pp. 9–10

"Royalty Rates For Proven Pharmaceuticals," March 1991, pp. 7–8

"Techniques for Comparing and Analyzing License Agreements," September 1991, pp. 14–18